# United States Court of Appeals for the Federal Circuit

---

**JOHN H. BANKS, ET AL.,**
*Plaintiffs-Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-5067

---

Appeal from the United States Court of Federal Claims in consolidated Nos. 99-CV-4451, 99-CV-4452, 99-CV-4453, 99-CV-4454, 99-CV-4455, 99-CV-4456, 99-CV-4457, 99-CV-4458, 99-CV-4459, 99-CV-44510, 99-CV44511, 99-CV-44512, 00-CV-365, 00-CV-379, 00-CV-380, 00-CV-381, 00-CV-382, 00-CV-383, 00-CV-384, 00-CV-385, 00-CV-386, 00-CV-387, 00-CV-388, 00-CV-389, 00-CV-390, 00-CV-391, 00-CV-392, 00-CV-393, 00-CV-394, 00-CV-395, 00-CV-396, 00-CV-398, 00-CV-399, 00-CV-400, 00-CV-401, 05-CV-1353, 05-CV-1381, and 06-CV-072, Chief Judge Emily C. Hewitt.

---

Decided: January 28, 2014

---

EUGENE J. FRETT, Sperling & Slater, P.C., of Chicago, Illinois, argued for plaintiffs-appellants. Of counsel on the brief were MARK E. CHRISTENSEN, Christensen &

Ehret, LLP, of Chicago, Illinois, and JOHN EHRET, of
Olympia Fields, Illinois.

ELIZABETH ANN PETERSON, Attorney, Environment &
Natural Resources Division, United States Department of
Justice, of Washington, DC, argued for defendant-
appellee. With her on the brief was IGNACIA S. MORENO,
Assistant Attorney General.

BRIAN T. HODGES, Pacific Legal Foundation, of
Bellevue, Washington, and R.S. RADFORD, of Sacramento,
California, for amicus curiae Pacific Legal Foundation.

───────────────

Before RADER, *Chief Judge*, LINN, and WALLACH, *Circuit
Judges*.

WALLACH, *Circuit Judge*.

These consolidated individual actions were brought by
thirty-seven lakefront property owners seeking just
compensation under the Fifth Amendment of the United
States Constitution for a partial physical taking of their
respective properties by the United States Army Corps of
Engineers ("Corps"). The United States Court of Federal
Claims dismissed the actions as time-barred. Because the
Court of Federal Claims violated this court's mandate in
*Banks v. United States* (*Banks II*), 314 F.3d 1304, 1310
(Fed. Cir. 2003), and clearly erred in finding that
Appellants knew or should have known of their claims
before 1952, the Court of Federal Claims' dismissal is
reversed.

BACKGROUND

I. The St. Joseph Harbor Jetties

Beginning in the 1830s, the Corps began constructing
two major harbor jetties on Lake Michigan near the St.
Joseph River. These jetties protrude outward from the

mouth of the river into the body of the lake. They were periodically extended until 1903, when they reached their current length. After 1903, major construction on the jetties ceased until 1950, when the Corps began a project to encase the jetties in steel-sheet piling. This project was completed in 1989.

Appellants (also referred to as "Plaintiffs") are landowners along approximately four and one-half miles of the eastern shore of Lake Michigan, south of the jetties. This shoreline is eroding naturally, but Appellants allege the jetties block the flow of sand and sediment from the river and the lakeshore north of their properties. Specifically, they argue that the structures interrupt the natural littoral drift within the lake, leading to increased erosion on their properties, amounting to an unlawful taking under the Fifth Amendment.

The Corps has also been concerned with erosion along the Lake Michigan shoreline. In 1958, the Corps released a "Beach Erosion Control Study" (the "1958 Study") that examined the effects of beach erosion on Berrien County, Michigan, where the St. Joseph jetties are located. This Report documented increased erosion in certain areas as a result of the jetties and recommended that a nourishment program "be initiated at the earliest practicable date." J.A. 5939. This program did not target Appellants' land because the land was then private and ineligible for federal funding. Nonetheless, the project was expected to benefit them by "restoration of normal littoral drift" in the area. J.A. 5959.

In 1968, Congress enacted the "Rivers and Harbors Act," which authorized the Secretary of the Army to "investigate, study, and construct projects for the prevention or mitigation of shore damages attributable to Federal navigation works." River and Harbor Act of 1968, Pub. L. No. 90-483, § 111, 82 Stat. 731, 735 (1968) (codified as amended at 33 U.S.C. § 426i (2012)).

Pursuant to this authority, the Corps proposed a plan to mitigate the erosion caused by the jetties by dumping sand into feeder beaches located to the north of Appellants' properties. This endeavor was projected to "provide the quantities of littoral material interrupted by the [jetties] to the shores downdrift." J.A. 5061.

Implemented in 1976, the mitigation plan "involved placing fine sand from the harbor maintenance dredging on the downdrift [southerly] beaches." *Banks v. United States* (*Banks I*), 49 Fed. Cl. 806, 818 (2001), *rev'd*, 314 F.3d 1304 (Fed. Cir. 2003) (internal quotation marks and citation omitted). After fifteen years of beach nourishment, the mitigation efforts shifted to using coarser sediment, in the hope it would have a longer retention time than fine sand. Eventually, in 1995, the Corps dumped "barge-loads of large rocks into the lake." *Id.* at 819.

In relation to these projects, the Corps released a series of reports in 1973, 1996, 1997, and 1999 on the erosive effects of the jetties and the progress of mitigation efforts. There is also an April 20, 1998, newspaper article relating to the erosion.

The 1973 Report "has been described, without contradiction, 'as the first credible look at the St. Joseph Harbor structures in estimating the total amount of material trapped in the structures.'" *Banks v. United States*, 78 Fed. Cl. 603, 612 (2007) ("*Liability Op.*"). The Corps started implementing mitigation programs after this Report.

The 1996 Report concluded that the St. Joseph shoreline was "in a state of recession" and that the erosion that occurs during lakebed downcutting[1] is "permanent."

---

[1] Downcutting is explained as follows: "If the sand cover to glacial till is depleted, the energy of the waves and the shifting of the sand, which acts as 'sandpaper,'

Larry E. Pearson, Andrew Morang & Robert B. Nairn, U.S. Army Corps of Engineers, *Geologic Effects on Behavior of Beachfill and Shoreline Stability for Southeast Lake Michigan* 9, 48 (1996) ("1996 Report"). However, the Report also indicated uncertainty regarding the effects of mitigation efforts: the mitigation program "may provide at least partial protection to the underlying glacial till along and offshore of the feeder beach and the waterworks revetment section of shore. It is unclear whether the beach nourishment is having any negative or positive impact along the 3.5-km revetment section of shoreline south of the waterworks." *Id.* at 49; *see also Banks II*, 314 F.3d at 1307.

The 1997 Report observed that some areas were benefitting from nourishment but in other areas the results were "questionable." J.A. 5516. The 1999 Report—made public in 2000—identified Lake Michigan as a cohesive, rather than sandy, shoreline, and stated that "'[e]rosion of the consolidated layer [underlayer of a cohesive coastline] is generally irreversible.'"[2] *Banks I*, 49

---

can cause the lake bottom to erode and thus lower in a process referred to as 'downcutting.'" *Liability Op.*, 78 Fed. Cl. at 622.

[2] "The composition of the lakebed is relevant because the composition affects erosion and mitigation processes." *Liability Op.*, 78 Fed. Cl. at 622. A sandy lakebed is made up of materials that are loosely deposited, or easily dispersed. *Id.* at 621. Thus, according to the Government's expert, "as long as the sand supply south of the harbor is restored to the pre-harbor levels, then we can assume directly that the erosion will remain the same as pre-harbor levels, all other things aside." *Id.* (internal quotation marks and citation omitted). Conversely, in a cohesive lakebed, the materials are bound together and are not "freely mobile." *Id.* (internal quotation marks and citation omitted). Cohesive shores are thus "more

Fed. Cl. at 823 (quoting J.A. 5637). The 1999 Report also found that the effects of the nourishment programs were limited because the programs were based on the assumption that the coastline was sandy, with an unlimited sand supply, and not cohesive. Appellants relied on the 1999 Report in arguing their claims were not time-barred and stated that "the language in this [R]eport is the first clear indication of permanent damage caused by the harbor structures." *Id.* (internal quotation marks and citation omitted).

## II. Procedural History

This case began in 1999, when a majority of Appellants filed suit in the Court of Federal Claims against the Government claiming an unconstitutional taking under the Fifth Amendment.[3]  *See* 28 U.S.C. § 1491 (1994). In 2001, the Government filed a Motion to Dismiss the Complaint as being time-barred. There was already a "well-developed" evidentiary record before the

---

complicated" because the "sand acts to abrade, sort of like sandpaper, the till." *Id.* at 622 (internal quotation marks and citation omitted). However, "[t]here's no scientific knowledge as to . . . when you increase your erosion and when you may decrease your erosion." *Id.* In any event, "what's critical about till downcutting is . . . [o]nce it erodes, it does not recover." *Id.* Stated simply, if a shoreline is sandy, mitigation will be more successful than if the shoreline is cohesive.

[3] The original July 9, 1999, Complaint was filed on behalf of a "proposed class" of "approximately 200 landowners who own the shoreline property in the area extending 53,000 feet south from the St. Joseph Harbor jetties." J.A. 4939. The Court of Federal Claims denied class certification, and the thirty-seven Plaintiffs in this action filed separate Complaints. Appellants' counsel treats the allegations in the Complaints as the same. *See Banks I*, 49 Fed. Cl. at 808.

court because the parties had been preparing for trial. *Banks I*, 49 Fed. Cl. at 809 n.4. Appellants also offered expert testimony from Dr. Guy Meadows, a mechanical engineering professor at the University of Michigan. The Court of Federal Claims granted the Motion and dismissed for lack of subject matter jurisdiction, finding that the claims had accrued in 1989 and were therefore barred by the Tucker Act's six-year statute of limitations. *Id.* Appellants appealed, and this court reversed and remanded in 2003, holding that Appellants' claims did not materialize until 2000, when the Corps' Reports "collectively indicated that the erosion was permanent and irreversible." *Banks II*, 314 F.3d at 1310. Specifically, this court held: "We are satisfied that the [P]laintiffs met their jurisdictional burden before the Court of Federal Claims." *Id.*

On remand, the Court of Federal Claims held separate trials on liability and damages. On June 4, 2007, the case proceeded to the trial on liability. *Liability Op.*, 78 Fed. Cl. 603. The primary issues addressed were: (1) the zone of influence of the jetties and whether Appellants' properties were located within that zone; (2) whether the composition of the lakebed adjacent to the property was sandy or cohesive; and (3) the effectiveness of the beach nourishment mitigation program. *Id.* at 613–14. The Court of Federal Claims concluded that, contrary to the allegations in Appellants' Complaints, the jetties were impermeable to sand before they were encased in steel. *See id.* at 636. The court also found that the United States was liable for 30% of erosion between 1950 and 1970, after each owner's acquisition of his or her property. It held that, after 1970, the United States was responsible for 30% of any losses to erosion that had not been effectively mitigated. *Id.* at 656. In so concluding, the Court of Federal Claims "heard testimony from 22 witnesses and received some 75 exhibits into evidence." *Id.* at 608.

Following the *Liability Opinion*, Appellants made additional motions, including a Motion in Limine based on the law-of-the-case doctrine to preclude (1) all evidence that the erosion suffered by Appellants was not permanent and irreversible; and (2) evidence relating to the composition of the nearshore lakebed adjacent to Appellants' properties. J.A. 1859. The Court of Federal Claims denied the Motion as to both requests. Appellants also moved to clarify the measure of damages. The court granted the motion to clarify and modified its ruling, finding "that property owners at the time of the taking are entitled to compensation for 'all damages, past, present, and prospective.'" J.A. 1755 (internal citation omitted). The court then held a trial on damages from April 18–21, 2011, and from April 25–28, 2011. *Banks v. United States* (*Banks III*), 102 Fed. Cl. 115, 120 (2011).

After the Court of Federal Claims conducted the damages trial, it found there was "a jurisdictional issue that arose in connection with its drafting of the trial opinion." *Banks v. United States*, 99 Fed. Cl. 622, 623 (2011) (opinion requesting additional briefing). The court then directed the parties to file additional briefing addressing whether the Court of Federal Claims had jurisdiction to hear Appellants' claims. *Id.* at 626. Specifically, the court asked the parties to brief the following two questions:

> 1) Given the court's finding after the trial of liability that the jetties were impermeable to sand before they were encased in steel sheet piling, and given the Corps' acknowledgement of the erosional impact of "harbor structures" in the 1958 Study, on what date did [P]laintiffs' claims accrue? Does the court possess subject matter jurisdiction to hear [P]laintiffs' claims?
> 2) Does the Federal Circuit's determination that [P]laintiffs' claims accrued with the publication of three Corps [R]eports on mitigation constitute the

"law of the case" which may not be disturbed by the court notwithstanding inconsistent factual findings of the court after trial?

*Id.*

Following the supplemental briefing, on December 22, 2011, the Court of Federal Claims again found it lacked jurisdiction. The court additionally presented findings "in the alternative" on the merits of the case, stating if "any appeal should disagree with the court's view of its jurisdiction, and to avoid the possibility . . . of a repetitive trial, the court also presents here its findings from the trial." *Banks III*, 102 Fed. Cl. at 120.[4]

Appellants timely appealed. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012).

### DISCUSSION

The principal issues on appeal are (1) whether this court's opinion in *Banks II* precluded the Court of Federal Claims from reconsidering when Appellants' claims accrued for the purposes of subject matter jurisdiction, and (2) whether Appellants knew or should have known that their claims accrued by 1952.

---

[4] Specifically, the Court of Federal Claims held:
Since 1970, the Corps' mitigation efforts have prevented the jetties from causing erosion to [P]laintiffs' properties, with one exception. Further, [P]laintiffs have failed to prove, with regard to any of [P]laintiffs' properties—whether by comparing the cost of shore protection to the dollar amount of their reasonably foreseeable damages or by some other means—that the installation of shore protection would be sound economy.
*Banks III*, 102 Fed. Cl. 115.

## I. Standard of Review

This court reviews legal holdings de novo and examines factual findings for clear error. *Bell BCI Co. v. United States*, 570 F.3d 1337, 1340 (Fed. Cir. 2009). "[T]he interpretation by an appellate court of its own mandate is properly considered a question of law, reviewable de novo." *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 950 (Fed. Cir. 1997). A dismissal for lack of jurisdiction by the court below is also a legal conclusion reviewed de novo. *Tex. Peanut Farmers v. United States*, 409 F.3d 1370, 1372 (Fed. Cir. 2005).

## II. Subject Matter Jurisdiction

The Tucker Act allows plaintiffs to sue the United States for claims founded upon the Constitution, Acts of Congress, agency regulations, contracts with the United States, "or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491. Title 28 U.S.C. § 2501 limits this allowance to a period of six years. The six-year limitation operates as a suspension of sovereign immunity, because without explicit Congressional authorization, the United States may not be sued. *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Thus, the statute's six-year time frame is a limited jurisdictional window in which plaintiffs have the ability to bring a claim against the Government. 28 U.S.C. §§ 1491, 2501.

## III. The Mandate Rule

The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–816 (1988) (internal quotation marks

and citation omitted). The rule encourages both finality and efficiency in the judicial process by preventing relitigation of already-settled issues. *Id.* at 816. The mandate rule, encompassed by the broader law-of-the-case doctrine, dictates that "an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pa. R. Co.*, 334 U.S. 304, 306 (1948); *see also Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1580 (Fed. Cir. 1983) (explaining that the law-of-the-case doctrine was "judicially created to ensure judicial efficiency and to prevent the possibility of endless litigation"). Once a question has been considered and decided by an appellate court, the issue may not be reconsidered at any subsequent stage of the litigation, save on appeal. *Cf. In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895) ("Whatever was before [the Supreme Court], and disposed of by its decree, is considered as finally settled. . . . If the circuit court mistakes or misconstrues the decree of this court, and does not give full effect to the mandate, its action may be controlled . . . upon a new appeal.").

Under the mandate rule, a court below must adhere to a matter decided in a prior appeal unless one of three "exceptional circumstances" exist: (1) subsequent evidence presented at trial was substantially different from the original evidence; (2) controlling authority has since made a contrary and applicable decision of the law; or (3) the decision was clearly erroneous "and would work a manifest injustice." *Gindes v. United States*, 740 F.2d 947, 950 (Fed. Cir. 1984) (internal quotation marks and citation omitted). This rule is limited to issues "actually decided, either explicitly or by necessary implication" in the previous litigation. *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1335 (Fed. Cir. 2004).

Appellants' first jurisdictional argument is that the Court of Federal Claims violated this court's mandate and that none of the three exceptions gave it the power to do

so. The Government counters that the Court of Federal Claims "correctly concluded that the issue here—whether Banks knew or should have known of the claims before the refurbishment and mitigation projects were undertaken in the 1950s and 1970s—was not considered or decided by this Court in *Banks II*." Appellee's Br. 30.

To determine whether this court's mandate in *Banks II* was violated, its scope must first be established. The *Banks II* court prefaced the analysis by stating its focus: "The issue before this court on appeal is whether the Court of Federal Claims erred in finding that the [P]laintiffs' claims fell outside the applicable statute of limitations." *Banks II*, 314 F.3d at 1308. After applying the analogous case of *Applegate v. United States*, 25 F.3d 1579 (Fed. Cir. 1994), the court held that:

> We are satisfied that the [P]laintiffs met their jurisdictional burden before the Court of Federal Claims on the basis of the justifiable uncertainty of the permanence of the taking caused by the actual mitigation efforts of the Corps. The statute of limitations did not begin to run until the Corps issued the 1996, 1997, and 1999 Reports. Because each [R]eport was issued less than six years before [P]laintiffs filed their [C]omplaints, each [C]omplaint was timely.

*Banks II*, 314 F.3d at 1310 (citation omitted).

On remand, the Court of Federal Claims again dismissed the case, finding Appellants' Complaints were untimely. It held its dismissal was not barred by the mandate rule, on the ground that this court's decision did not address "whether [P]laintiffs' claims accrued before the [G]overnment made its first promises of mitigation." *Banks III*, 102 Fed. Cl. at 150. Finding that "the jetties were impermeable to sand before they were encased in steel sheet piling," *id.* at 131, the Court of Federal Claims held the Appellants' claims accrued before 1952 and

dismissed the case for want of jurisdiction. The Court of Federal Claims found that for Appellants' claims to have been timely filed, the erosion must have stabilized after 1952, six years before the 1958 Study, which Appellants argued created justifiable uncertainty about the permanence of the taking. *Id.* at 133–34.

The Government argues that *Banks II* never decided whether the claims accrued before 1952, because both this court and the Court of Federal Claims "accepted as true the allegations of the Complaints, including the allegation that the jetties caused no damage before 1950." Appellee's Br. 31–32. The Government therefore contends that the Court of Federal Claims did not violate the mandate rule when it considered that issue on remand.

The problem with the Government's position is that neither the Court of Federal Claims nor this court accepted as true all the allegations in Appellants' Complaint. When reviewing a motion to dismiss for lack of subject matter jurisdiction, a court accepts only uncontroverted factual allegations as true for purposes of the motion. *Gibbs v. Buck*, 307 U.S. 66, 72 (1939). "If a motion to dismiss for lack of subject matter jurisdiction, however, challenges the truth of the jurisdictional facts alleged in the complaint, the district court may consider relevant evidence in order to resolve the factual dispute." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988); *see also Engage Learning v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993). In such cases, the plaintiff has the burden of proving subject matter jurisdiction by a preponderance of the evidence. *Reynolds*, 846 F.2d at 748 (citing *Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969)). Additionally, "[i]f the Rule 12(b)(1) motion [to dismiss] denies or controverts the pleader's allegations of jurisdiction . . . the movant is deemed to be challenging the factual basis for the court's

subject matter jurisdiction." *Cedars-Sinai Med. Ctr.*, 11 F.3d at 1583.

In *Banks I*, the Court of Federal Claims stated that "[b]ecause the parties were preparing for trial at the time [D]efendant filed its [M]otion to [D]ismiss, the evidentiary record is well-developed. The court has before it the anticipated trial exhibits prepared by the parties and filed in accordance with the pre-trial scheduling order." *Banks I*, 49 Fed. Cl. at 809 n.4. The court then explained that "Plaintiffs cannot rely merely on the allegations in the [C]omplaint. Because [P]laintiffs bear the burden of proof by a preponderance of the evidence, they must offer relevant, competent evidence to show that they filed suit within six years of the accrual of their claims." *Id.* at 809 (internal citation omitted). Explicitly looking outside of the Complaint, the court granted the Government's Motion to Dismiss, stating: "The court observes that [P]laintiffs' claims that they were uncertain about the permanence of the erosion damage until 1999 are contradicted by their own evidence."[5] *Id.* at 824.

Holding those findings were clearly erroneous and that Appellants' claims did not accrue until 2000, the *Banks II* court relied on the technical Reports, not solely on the Appellants' allegations in the Complaint. It is simply inaccurate to claim that the factual allegations of the Complaint were taken as true by either court.

*Banks II* did not "leave open" the issue of when Plaintiffs' claims accrued. The *Banks II* court held the Complaints were not barred by the six-year statute of

---

[5] The *Banks II* court stated that the 1996, 1997, and 1999 Reports were all in evidence before the Court of Federal Claims. *Banks II*, 314 F.3d at 1307 (explaining "[t]he evidence before the Court of Federal Claims included three technical [R]eports issued by the Corps").

limitations. Necessary and predicate to the holding was a finding that the mitigation efforts delayed claim accrual.

Because the *Banks II* mandate decided the accrual date, the Court of Federal Claims was permitted to revisit this issue only if one of the three exceptions to the mandate rule applied. The Court of Federal Claims did not find, and the Government did not argue, that the *Banks II* decision was clearly erroneous or that there was a change in controlling precedent. Thus, only the third exception—whether subsequent evidence presented at trial was substantially different from the original evidence—is relevant.

The Government contends that the "most persuasive evidence that the jetties had caused erosion of the Banks properties" was the 1958 Study, which was admitted in July 2007, six years and four years after *Banks I* and *Banks II*, respectively. Appellee's Br. 34 (citing *Banks III*, 102 Fed. Cl. at 134). Appellants respond that "the evidence is not new, and far from being substantially different, is merely cumulative of the jurisdictional evidence that was before this [c]ourt." Appellants' Br. 27.

When a party offers additional evidence that is consistent with previously-offered evidence, but is not new or different in any real sense, a court should decline the invitation to revisit its previous determination. *See Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 698 (Fed. Cir. 2001) (noting that the district court stated, "[a]lthough Intergraph may have obtained *more* evidence related to the FTC's actions, the Federal Circuit was certainly aware of the actions"); *see also United States v. Bartsh*, 69 F.3d 864, 867 (8th Cir. 1995) (finding that the Appellant presented "no new substantive evidence, but merely a recalculation of the same evidence that was offered at the sentencing hearing"). In the instant case, while the Court of Federal Claims may have examined the evidence more thoroughly in the bifurcated liability

and damages trial, all of it was consistent with evidence that was before both the Court of Federal Claims on the Government's Motion to Dismiss and this court on appeal in 2003.

The evidence before the Court of Federal Claims after this court's mandate issued was not "new" but merely cumulative of evidence before it in 2001. The evidentiary record before the Court of Federal Claims in 2001 included the 1996,[6] 1997,[7] and 1999[8] Reports, a 1998 newspaper article,[9] and evidence from Plaintiffs' expert,

---

[6] The 1996 Report, in relevant part, states that the shoreline is in recession and that "[e]vidence has been presented by Buckler (1981) showing a southward progression of increased erosion rates *since at least 1829.* Further studies by Buckler and Winters (1983) revealed average bluff recession rates for the area between St. Joseph and Shoreham of approximately 0.6 m/year between *1829 and 1977.*" J.A. 5031 (emphases added).

[7] The 1997 Report makes similar findings: "The harbor jetties were constructed originally in 1903 and have been estimated to trap approximately 84,000 [cubic meters] of sediment per year." J.A. 5434.

[8] The 1999 Report similarly states "the removal of sand from the littoral transport system has been occurring from the time of construction; in some cases for *over one hundred years.*" J.A. 5637 (emphasis added).

[9] In the record, and cited by the Court of Federal Claims in 2001, was also a 1998 newspaper article from the Herald-Palladium, titled "Too soon to tell if erosion experiment will help." The article, quoting a physical scientist for the Corps, Charles Thompson, stated: "the project began only in the early 1970's so basically we have 80, 90, or 100 years of non-mitigation to make up for. . . . For most of the life of the St. Joseph's Harbor structures [jetties], little was done to mitigate the effects of those

Dr. Meadows,[10] all of which contained information similar to that in the 1958 Study.

The sum of that evidence is that erosion has been occurring since at least 1903. The evidence was not only before the Court of Federal Claims in *Banks I*; the court referred to, and relied upon, it extensively. The same evidence was before this court in 2003, as evidenced by the fact that the basis for this court's opinion in *Banks II* was the 1996, 1997, and 1999 Reports. This court is not persuaded that any "new" evidence required reexamining jurisdiction that had already been decided by this court.

In evaluating the scope of the mandate, the actions of the Court of Federal Claims must not be inconsistent with the letter or spirit of the mandate. *Engel Indus. Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999). Indeed, "all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication." *Id.* at 1383. The broad mandate issued by this court found that Appellants' claims did not accrue until the 1996, 1997, and 1999 Reports. This decision necessarily decided that

---

structures." *Banks I*, 49 Fed. Cl. at 821 (internal quotation marks and citation omitted).

[10] The Court of Federal Claims also cited to testimony from Dr. Meadows that the jetties had been causing erosion since their completion in 1903. Specifically, Dr. Meadows testified that:

> The harm that has been done is the accumulated harm since 1903 [(the construction date of the harbor jetties)]. That structure has done two things. It has blocked the shore parallel transport of material from north to south and it has also deflected some of that material offshore and, hence, being lost forever once it's beyond the depth of closure.

*Banks I*, 49 Fed. Cl. at 817 (citation omitted).

the claims did not accrue prior to 1952. The Court of Federal Claims' *Banks III* holding that the claims accrued before that time is therefore reversed.

## IV. Accrual Suspension

The Court of Federal Claims further erred in its analysis of accrual suspension. The accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed ("the accrual suspension rule"). *Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000) (finding that, when determining when a taking claim accrues, "the key issue is whether the permanent nature of the taking was evident such that the landowner should have known that the land had suffered erosion damage"); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988); *Kinsey v. United States*, 852 F.2d 556, 557 n.* (Fed. Cir. 1988) ("A claim does not accrue unless the claimant knew or should have known that the claim existed."); *see also Holmes v. United States*, 657 F.3d 1303, 1322 n.15 (Fed. Cir. 2011). For the accrual suspension rule to apply, the claimant "must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (quoting *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc)). The inherently unknowable test "includes a reasonableness component." *Holmes*, 657 F.3d at 1320 ("While we have stated that the 'concealed or inherently unknowable' formulation of the test for accrual suspension is 'more common and more precise' than the 'knew or should have known' formulation, we do not view that statement as eschewing the reasonableness component of the 'inherently unknowable' prong of the test.") (internal citation omitted).

The Court of Federal Claims found that Appellants' argument relating to accrual suspension based on the overruling of adverse precedent was waived because they did not raise it in their opening brief to that court. In the alternative, the court held that the accrual suspension rule was "inapplicable to [P]laintiffs' claims." *Banks III*, 102 Fed. Cl. at 144. On appeal, Appellants argue that accrual suspension should apply because they "should not reasonably have been expected to know that jetty-caused erosion was significantly damaging their properties until 1997." Appellants' Br. 23. The Government contends that Appellants "now raise[ ] a second accrual suspension argument that was not raised in the [Court of Federal Claims]" and that argument is waived. Appellee's Br. 40.

Appellants have not waived their accrual suspension arguments. The Court of Federal Claims cited Appellants' argument "that as late as 1997 it was not understood that the harbor jetties caused increased erosion in [P]laintiffs' zone. The implication of [P]laintiffs' argument is that their claims stabilized no earlier than 1997 because it was not understood at that time that the jetties were causing erosion in [P]laintiffs' zone." *Banks III*, 102 Fed. Cl. at 141. Though Banks did not use the term "accrual suspension" in making this argument, the substance is the same as that which it argues before this court. Accordingly, the argument is not waived.

The Court of Federal Claims held that "erosion caused by the jetties in [P]laintiffs' zone was a longstanding problem by 1952, beginning as early as 1903," *id.* at 138, and that the forty-nine-year passage of time and "well-documented" erosion would have made it "clear to a reasonable landowner . . . that the [G]overnment had effected a permanent taking,"[11] *id.* at 140. Appellants

[11] The Court of Federal Claims found that "[d]uring the forty-nine years between 1903, when the jetties

argue that they could not have known they had a takings claim until 1997, when the 1997 Report issued. The Government counters that Appellants' claims were not "inherently unknowable" and that they should have known about the erosion as early as 1950.

When there is a gradual physical process, such as erosion or flooding, the "stabilization doctrine" delays claim accrual until the situation has "stabilized." *See United States v. Dickinson*, 331 U.S. 745, 749 (1947). Thus, the statute of limitations under the Tucker Act only begins to run when it "becomes clear that the gradual process set into motion by the [G]overnment has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." *Boling*, 220 F.3d at 1370–71.

In making the determination of permanence, a court considers "the uncertainties of the terrain, the difficulty in determining the location of the government's easement, and the irregular process of erosion." *Id.* at 1373. Claims are deemed to accrue once the damage has "substantially encroached the parcels at issue and the damages were reasonably foreseeable." *Id.*

The Government argues that even if Appellants inferred from the various Corps Reports that the jetties had not caused the specific damage to their properties, "[they] w[ere] on notice of the well-documented connection between the jetties and erosion along the shore." Appellee's Br. 46. Likewise, the Court of Federal Claims implies that Appellants knew or should have known that the jetties were causing erosion because of the "general

---

reached their final length, and 1952, the jetties were responsible for 25% of the material eroded from Dr. Nairn's study area, the ten mile segment of shoreline south of the jetties." *Banks III*, 102 Fed. Cl. at 140.

pattern of erosion that followed the lengthening of the jetties in 1903." *Banks III*, 102 Fed. Cl. at 140.

Two factors complicate determining when Appellants knew or should have known of their alleged takings claims. First, the shorelines of Appellants' properties are subject to natural erosion and other natural fluctuations. As this court found in *Banks II*, "without human intervention, [erosion] occurs naturally at a rate of approximately one foot per year." 314 F.3d at 1306. Furthermore, Lake Michigan is subject to "[s]hort period fluctuations up to about 1.8 feet, caused by winds and differences in barometric pressures, [which] occur with annual frequency." J.A. 5939. Waves and storms also affect the shorelines: "Waves from both the northwest and southwest quadrants cause movement of beach material, but as evidenced by the much greater accumulation of beach material north of the St. Joseph Harbor structures, the predominant direction of littoral transport is southward." *Id.* The Government's own expert, Dr. Robert Nairn, a coastal engineer, testified that the slow process of erosion is "masked by far larger swings in the width of the beaches next to [P]laintiffs' properties caused by cross-shore sand transport, a cyclical process by which sand is moved offshore during times of high lake levels and returned to the shore during times of low lake levels." *Banks III*, 102 Fed. Cl. at 121.

That the Plaintiffs were aware of some erosion is not sufficient for the claim to accrue. *See Nw. La. Fish & Game Pres. Comm'n v. United States*, 446 F.3d 1285, 1291 (Fed. Cir. 2006) (explaining because some growth of hydrilla is normal, the damage to Plaintiffs was not known until there was uncontrolled overgrowth and the Corps issued a final refusal to lower the water level). Indeed, the Corps itself stated that only 30% of the damage to Appellants' shorelines was attributable to the Corps' activity, meaning 70% of the damage to the subject properties was attributable to naturally occurring erosion.

J.A. 5770. Accordingly, it is unreasonable to assume that a property owner should have been able to discern the difference between the naturally occurring erosion and that caused by the jetties.

As found by this court in *Banks II*, Appellants could not reasonably have known the damage was "permanent" until the Corps issued its 1996, 1997, and 1999 Reports showing that its mitigation efforts could not reverse the damage caused by its jetties. *Banks II*, 314 F.3d at 1310. It is erroneous to hold Plaintiffs responsible for knowledge that the Government itself had disclaimed prior to the 1997 Report. *Cf. L.L.S. Leasing Corp. v. United States*, 695 F.2d 1359, 1366 (Fed. Cir. 1982) (by taking upon itself the obligation to report overtime usage, the Government relieved the lessor of monitoring such use). The Government itself explained in the 1958 Study that the Corps believed that the erosion was not permanent and could be mitigated and reversed. *Banks III*, 102 Fed. Cl. at 133. Moreover, in 1973, the Government believed that the jetty-induced erosion had not reached the majority of Appellants' properties.[12] The Government's mitigation efforts thus delayed when Appellants knew or should have known they had a claim.

Without a basis for imputing knowledge of the effect of the jetty-caused erosion on Appellants' properties, it was unreasonable to find that the Appellants were aware of their claim regarding the permanency of the taking before the 1990s Reports.

In light of the foregoing, and because "*Dickinson* discouraged a strict application of accrual principles in unique cases involving Fifth Amendment takings by continuous physical processes," *Applegate*, 25 F.3d at

---

[12] The 1973 Report found that the "area of adverse influence" of the jetties included properties less than 21,000 feet south of the harbor. J.A. 5776.

1582 (citing *Dickinson*, 331 U.S. at 749), the Court of Federal Claims' finding that Appellants knew or should have known of the damage prior to 1952 is clearly erroneous.

### V. The Alternative Merits Discussion is Not a Final, Appealable Decision

In *Banks III*, the Court of Federal Claims stated:

> For purposes of judicial efficiency, if the reviewing court in any appeal should disagree with the court's view of its jurisdiction, and to avoid the possibility of a trial opinion being drafted months or years after the trial, and the possibility of a repetitive trial, the court also presents here its findings from the trial. These findings are presented in the alternative and, in the absence of jurisdiction, do not entitle [P]laintiffs to just compensation in the amounts determined by the court.

102 Fed. Cl. at 120. In the absence of anything appealable, this court lacks appellate jurisdiction. *See* 28 U.S.C. § 1295(a)(3). To be final and appealable, *see* Fed. R. Civ. P. 54, a decision must end the litigation on the merits, *Catlin v. United States*, 324 U.S. 229, 233 (1945), and the judge must "clearly declare[] h[er] intention in this respect," *United States v. F. & M. Schaefer Brewing Co.*, 356 U.S. 227, 232 (1958). Here, contrarily, the Court of Federal Claims reasoned that, "[b]ecause [the] references [to when certain shore protection measures were undertaken] are scattered across several thousand pages of trial testimony and documentary evidence," it would not decide "which of [P]laintiffs' shore protection expenses were incurred between 1950 and 1970, the period of time during which the government was responsible for 30% of the erosion" "in the absence of briefing or a stipulation by the parties." *Banks III*, 102 Fed. Cl. at 212. It declined to "undertake to determine

which of [P]laintiffs' expenses were incurred after 1970, the period of time during which the [G]overnment has completely mitigated the erosion caused by the jetties." *Id.* The Court of Federal Claims added that "[i]f the reviewing court does not agree with the court's determination that it lacks jurisdiction to address [P]laintiffs' claims," it would direct the parties to file either a stipulation or briefing "to enable the court to determine which of [P]laintiffs' shore protection expenses were incurred prior to 1970 and which were incurred subsequent to 1970." *Id.*

The Court of Federal Claims' alternative merits discussion is not a final and appealable decision over which this court has jurisdiction. On remand, the Court of Federal Claims may reconsider any merits rulings that were rendered at a time it mistakenly believed it lacked jurisdiction. In light of the Court of Federal Claims' clearly erroneous fact finding on claim accrual, it is appropriate that there be no law-of-the-case or comparable obstacle preventing it from reconsidering its earlier, related findings on the merits. This court's prior mandate—that the claims did not accrue until the 1999 Report—is still law-of-the-case, binding below.

CONCLUSION

The Court of Federal Claims' dismissal for lack of jurisdiction is reversed and the case is remanded to the Court of Federal Claims for further proceedings.

**REVERSED AND REMANDED**