NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**FRAZER/EXTON DEVELOPMENT, L.P.,
WHITELAND HOLDINGS, L.P.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-2143

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01081-MMS, Chief Judge Margaret M. Sweeney.

---

Decided:  April 7, 2020

---

MATTHEW MCDONALD, Steinmeyer Fiveash LLP, Tallahassee, FL, for plaintiffs-appellants.

DANIEL HALAINEN, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant-appellee.  Also represented by JEFFREY B. CLARK, ERIKA KRANZ, ERIC GRANT.

---

Before MOORE, CLEVENGER, and CHEN, *Circuit Judges.*

CLEVENGER, *Circuit Judge.*

Whiteland Holdings, L.P. ("Whiteland") and Frazer/Exton Development, L.P. ("Frazer/Exton") (collectively "Appellants") appeal from an order from the Court of Federal Claims ("Claims Court") granting the Government's ("Appellee") motion to dismiss Appellants' physical takings claim for lack of subject-matter jurisdiction. *Whiteland Holdings, L.P. v. United States*, 141 Fed. Cl. 702 (2019), *reconsideration denied*, No. 18-1081L, 2019 WL 2158874 (Fed. Cl. May 17, 2019). The issue on appeal is whether the Claims Court erred in its holding that Appellants' claim accrued in 2011 and that the six-year statute of limitations[1] had expired prior to Appellants filing their claim. For the reasons set forth below, we affirm.

BACKGROUND

I.  Facts

Foote Mineral Company ("Foote Mineral") acquired the subject property ("Foot Mineral Superfund Site")[2] in 1941. *Whiteland Holdings*, 141 Fed. Cl. at 705. The United States Government thereafter purchased the Foot Mineral

---

[1]    Any claim against the United States filed in the Court of Federal Claims must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501.

[2]    The subject property is located at 15 South Bacton Hill Road in Frazer, Chester County, Pennsylvania, and is situated primarily in East Whiteland Township. On October 14, 1992, the Environmental Protection Agency added the subject property to the General Superfund Section of the National Priorities List. National Priorities List for Uncontrolled Hazardous Waste Sites, 57 Fed. Reg. at 47,183–84. The subject property then became known as the "Foote Mineral Superfund Site."

Superfund Site in 1942 and engaged Foote Mineral to conduct lithium chemical processing operations for the Government during World War II. *Id.* The Government also utilized the Foot Mineral Superfund Site for the production of various lithium and munition products as well as the stockpiling and storage of exotic ores. *Id.* Foote Mineral reacquired the property in July 1946, after the conclusion of World War II. *Id.* The Government, however, continued to operate the site into the 1950s, engaging Foote Mineral to produce and manufacture lithium halides and lithium metal products, both in liquid and solid form, to ground a variety of minerals and alloys, to produce inorganic fluxes for the steel industry, and to store various exotic ores for ammunition production and other potential uses as part of the wartime effort. *Id.*

Unsurprisingly, site operations "created large quantities of hazardous substances." *United States v. Frazer Exton Dev. LP*, No. 07-2666, 2008 WL 2876570, at *1 (E.D. Pa. July 24, 2008). Those hazardous substances "were disposed of in limestone quarries" on the subject property, resulting in the contamination of "soil on the Site and the ground water beneath the Site," and "causing a plume of contamination that extends approximately two miles east" of the subject property. *Id.*

Foote Mineral ceased its disposal practices in or around 1975 and "engaged in cleanup and monitoring efforts" throughout the 1970s and 1980s. *Id.* The United States Environmental Protection Agency ("EPA") "became involved in remediation efforts in 1988." *Id.* On June 29, 1990, the EPA and Foote Mineral entered into a consent order that required Foote Mineral to "conduct a groundwater survey, institute a five-year monitoring program of private drinking water supplies, and provide an alternative drinking water source to affected residents." *Id.* Foote Mineral discontinued site operations in 1991. *Id.*

In September 1996, the EPA, pursuant to a second consent order, required Foote Mineral to "conduct a remedial investigation and feasibility study." *Id.* On November 20, 1998, however, Frazer/Exton acquired the Foote Mineral Superfund Site. Frazer/Exton did so with "full knowledge of the existing contamination of the Site." *Id.* In its purchase agreement, Frazer/Exton agreed to assume liabilities, obligations, and/or responsibilities arising under any applicable environmental law for environmental conditions including, among others, those arising in connection with consent orders. In accordance therewith, Frazer/Exton completed a Remedial Investigation Report and a Feasibility Study Report, pursuant to the 1996 consent order, in June 2001.

On August 11, 2003, the EPA held a public hearing regarding its proposed plan for the Foote Mineral Superfund Site. Frazer/Exton's president was at that public hearing, acknowledged that Frazer/Exton owned the site, and stated that (1) Frazer/Exton was "wholly supportive of the [EPA's] proposed remedy and the proposed plan" and (2) the company "look[ed] forward to an expeditious negotiation of the implementation of the remedy with the EPA." *Whiteland Holdings*, 141 Fed. Cl. at 707 (citations omitted).

The EPA issued a Record of Decision—selecting a permanent remedy for the Foote Mineral Superfund Site—on March 31, 2006, and notified Foote Mineral and Frazer/Exton "of their potential liability to remedy the site" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). *Frazer Exton*, 2008 WL 2876570, at *1. Frazer/Exton "volunteered to perform the work required by the [Record of Decision]" on July 21, 2006. *Id.* Frazer/Exton and the EPA then entered into a proposed consent order "for the purpose of commencing the design phase of the remedial action contemplated by the [Record of Decision]" that provided for Frazer/Exton to "pay for and perform the remedial action

that was selected by the EPA in the [Record of Decision]." *Id.* at *1–2.

While conducting the remediation work, Frazer/Exton "learned that the volume of contaminated soil [was] larger than was estimated in the [Record of Decision]." *Id.* at *2. On April 7, 2008—after a thirty-day public comment period and an EPA public availability session regarding the additional contamination—the EPA signed an Explanation of Significant Differences which amended the Record of Decision by expanding the area to be capped, revising clean-up standards for certain contaminants, and allowing the use of permeability barriers in certain circumstances. *Id.* On July 24, 2008, the United States District Court for the Eastern District of Pennsylvania approved and entered the consent order, finding that it was "procedurally and substantively fair" and "reasonable and consistent with CERCLA's goal of ensur[ing] the cleanup of the nation's hazardous waste sites." *Id.* (internal quotation marks omitted).

On October 28, 2010, the EPA issued a Superfund Preliminary Close Out Report pertaining to the Foote Mineral Superfund Site. According to Frazer/Exton, it "completed the investigation, removal, and/or remediation of the Site in 2011." *Whiteland Holdings*, 141 Fed. Cl. at 708 (citations omitted). Whiteland acquired the subject property via sheriff's sale on November 17, 2016. On September 11, 2017, pursuant to Pennsylvania law, Whiteland executed an environmental covenant (the "Pennsylvania Environmental Covenant" or "PEC") in favor of Frazer/Exton, which effectuated the land use restrictions that were present in the July 25, 2008 consent order. The EPA approved the PEC nine days later.

## II. Procedural History

Frazer/Exton filed suit before the Claims Court on July 24, 2018, and amended its complaint on August 24, 2018, repeating the same allegations but adding Whiteland as an

additional plaintiff.  Appellants alleged that the Government's operations and disposal methods at the Foote Mineral Superfund Site resulted in environmental contamination, effecting a physical taking without just compensation in contravention of the Fifth Amendment to the United States Constitution.

Appellee subsequently moved to dismiss the amended complaint, alleging that Appellants' "takings claim accrued far more than six years before Frazer/Exton filed suit," that "Frazer/Exton has waived" any Takings Clause claim against the federal government with respect to the Foote Mineral Superfund Site, and that both Frazer/Exton and Whiteland lack standing because "neither Frazer/Exton nor Whiteland held any sort of property interest in the Foote Mineral Superfund Site at the time of the [alleged] taking." *Whiteland Holdings*, 141 Fed. Cl. at 709 (citations omitted).

The Claims Court took notice of certain public documents and concluded that Appellants' takings claim accrued no later than 2011—when Appellants represented that they had completed the remediation—which was more than six years before filing suit, and dismissed the amended complaint for lack of jurisdiction under § 2501. *Id.* at 712–13.  Appellants filed a motion for reconsideration on March 8, 2019, which the Claims Court denied on May 17, 2019.  *Whiteland Holdings, L.P. v. United States*, No. 18-1081L, 2019 WL 2158874 (Fed. Cl. May 17, 2019).  Appellants timely appealed on July 12, 2019.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

STANDARD OF REVIEW

We review the Claims Court's legal conclusion that it lacked subject matter jurisdiction *de novo*.  *Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018).  "In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in

the light most favorable to the plaintiff." *Id.* (quoting *Estes Exp. Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014)). We review the Claims Court's determinations of jurisdictional facts for clear error. *Id.*

## DISCUSSION

The Supreme Court has recognized two kinds of takings: regulatory takings and physical takings. *See Washoe Cty., Nev. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014–15 (1992)). Although the Supreme Court has declined to set out a precise formula for determining whether a regulatory taking has occurred, these types of takings generally involve the regulation of private property.[3] *Id.* A physical taking, on the other hand, generally occurs when the government directly appropriates private property or engages in the functional equivalent of a "'practical ouster of [the owner's] possession.'" *Id.* (citation omitted).

Although Appellants' arguments on appeal focus largely on the EPA's regulatory land-use restrictions at the Foote Mineral Superfund Site, which are set forth in the PEC, the claim alleged in the amended complaint below, and in Appellants' preliminary statement on appeal, is for a physical, not a regulatory, taking. *See* S.A. 4; *see also* Appellants' Brief at 1–2 ("This is a Fifth Amendment takings case seeking damages for the United States' physical taking of Plaintiffs' property without just compensation."). Specifically, Appellants argue that the deposition of large amounts of hazardous substances at the Foote Mineral Superfund Site resulted in a "gradual [physical] taking by the United States." *Id.* at 2. Accordingly, the question for this

---

[3]  In *Lucas* and the other "regulatory takings" cases, property owners claimed that government regulation of their private property has gone "too far." *Washoe Cty.*, 319 F.3d at 1327.

court is not at what point did the EPA's land-use restrictions allegedly result in a regulatory taking of Appellants' property, but at what point did Appellants' physical takings claim accrue?

Where a taking is caused by a gradual physical process, accrual of the claim may be delayed until the situation has "stabilized" such that the "consequences of the inundation have so manifested themselves that a final account may be struck." *United States v. Dickinson*, 331 U.S. 745, 749 (1947); *see also Banks v. United States*, 314 F.3d 1304, 1308 (Fed. Cir. 2003). A final account may be struck "when it becomes clear that the gradual [physical] process set into motion by the government has effected a permanent taking." *Boling v. United States*, 220 F.3d 1365, 1370–71 (Fed. Cir. 2000). As explained in *Boling*, the "touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." *Id.* at 1373. Thus, the obligation to sue arises once the permanent nature of the government action is evident, regardless of whether damages are complete and fully calculable. *See Mildenberger v. United States*, 643 F.3d 938, 946 (Fed. Cir. 2011) (citing *Goodrich v. United States*, 434 F.3d 1329, 1336 (Fed. Cir. 2006)).

"[J]ustifiable uncertainty about the permanency of the taking," however, prevents accrual of a physical takings claim. *Boling*, 220 F.3d at 1372. Here, Appellants argue that Appellee's alleged taking by a gradual physical process did not stabilize until the disposal of hazardous waste resulted in land-use restrictions. According to Appellants, "[u]ntil the EPA assessed the remediation and determined the nature and extent of land use restrictions, there was no predictability or permanence as to the extent to which [Appellants'] property rights would be restricted," Appellants' Brief at 22, and thus they remained justifiably uncertain about the permanency of the taking. Those land use

restrictions are a result of government regulation, however, and do not constitute a physical taking.[4]  None of Appellants' cited cases support expanding the stabilization doctrine to cases where justifiable uncertainty extends beyond stabilization of the gradual physical taking, and up until the Government takes regulatory action.[5]  The court declines this opportunity to so extend.

---

[4]   While the land use restrictions effectuated in the PEC may or may not amount to a regulatory taking, Appellants' have only asserted a gradual physical takings claim against the Government.  Accordingly, Appellants have waived any argument that the PEC's restrictions constitute a regulatory taking.

[5]   These cases all concern ongoing physical processes where the permanency of the taking had not stabilized within six years of the lawsuit.  *See Dickinson*, 331 U.S. at 749 (holding claim for flooding did not accrue "as soon as" land was first subject to intermittent flooding in light of the "uncertainty of the damage" (*i.e.*, taking)); *Banks v. United States*, 741 F.3d 1268, 1280–82 (Fed. Cir. 2014) (holding finding that "Appellants knew or should have known of the damage prior to 1952 is clearly erroneous" where "it was unreasonable to find that the Appellants were aware of their claim regarding the permanency before the 1990s Reports" showing that Corps' "mitigation efforts could not reverse the damage caused by its jetties"); *Banks*, 314 F.3d at 1309–10 (holding the Government's promises to mitigate damages caused by a continuous physical process delayed accrual of a takings claim when the claimant demonstrated that the "'predictability [and permanence] of the extent of damage to the [claimant's] land' was made justifiably uncertain by the Corps' mitigation efforts.") (citations omitted); *Nw. La. Fish & Game Preserve Comm'n v. United States*, 446 F.3d 1285, 1290–92 (Fed. Cir. 2006) (holding claim that weed overgrowth attributed to water

Here, it is undisputed that the Government's and/or Foote Mineral's deposition of large amounts of hazardous substances into the soils and groundwater at the Foote Mineral Superfund Site ceased decades before Appellants filed suit on July 24, 2018. It is also undisputed that Appellants purchased the site with knowledge of the existing contamination. Thus, Appellants' invocation of the stabilization doctrine is unavailing. Nevertheless, Appellants could still successfully invoke the accrual suspension rule if they demonstrate that either (1) the Government "concealed its acts" or (2) the injury (*i.e.*, the taking) was "inherently unknowable." *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (internal quotation marks omitted). If, on the other hand, Appellants "knew or should have known that the claim existed," accrual will not be suspended. *Id.* The "knew or should have known" test for claim accrual is "used interchangeably" with the "concealed or inherently unknowable" test, although the latter is "both more common and more precise." *Ingrum v. United States*, 560 F.3d 1311, 1315 n.1 (Fed. Cir. 2009).

The Claims Court found Appellants' argument that their "harm did not exist until the loss of use and property

---

management did not accrue until Corps' refusal to draw down water made clear that problem was permanent); *Applegate v. United States*, 25 F.3d 1579, 1581–84 (Fed. Cir. 1994) (holding Government's promises to restore sand prevented stabilization of very gradual physical taking because "the landowners did not know when or if their land would be permanently destroyed."). In each case, the Court concluded that the claim accrued when the permanency of the gradual physical process stabilized and rendered damages foreseeable. In no case, however, did the court hold that accrual is suspended even after the gradual physical process stabilized and the permanent nature of the government action was evident.

value could be determined as a result of the Environmental Covenant," invokes the "inherently unknowable" prong of the accrual suspension rule. *Whiteland Holdings*, 141 Fed. Cl. at 711–12 (citation omitted). We agree. The "inherently unknowable" test involves a "reasonableness component." *Holmes v. United States*, 657 F.3d 1303, 1320–21 (Fed. Cir. 2011). Thus, this court must determine whether the Claims Court committed clear error in finding that Appellants' alleged ignorance of their claim prior to September 11, 2017 was unreasonable. Of particular note, the Claims Court found, while construing the complaint in the light most favorable to Appellants, that Frazer/Exton purchased the site with full knowledge of the existing contamination, *see Whiteland Holdings*, 141 Fed. Cl. at 706, that "Frazer/Exton was aware of the presence of bromate in the groundwater by 2003 at the latest, and the extended scope of the contamination prior to entry of the consent [order] in 2008 . . . and most importantly . . . [that] Frazer/Exton itself has averred that it completed the required remediation in 2011," *id.* at 712. For these and the other reasons adequately described in the Claims Court's Opinion and Order on Appellee's motion to dismiss, and in its Opinion and Order on Appellants' motion for reconsideration, the court holds that the Claims Court did not commit clear error in finding that Appellants knew or should have known of the permanency of the alleged physical taking, which began the accrual of their claim, by 2011.

## CONCLUSION

We hold that the Claims Court did not commit clear error in finding that Appellants knew or should have known of the scope and permanency of the alleged physical taking by at least 2011. Thus, the Claims Court did not err in finding that Appellants' takings claim accrued more than six years prior to the date on which they filed suit. Accordingly, the order dismissing the amended complaint for lack of subject-matter jurisdiction is

12        FRAZER/EXTON DEVELOPMENT, L.P. v. UNITED STATES

## **AFFIRMED**

COSTS

The parties shall bear their own costs.