Don **APPLEGATE** and Gayle **Applegate** (for themselves and a class of others similarly situated, totalling 271), Plaintiffs–Appellants,

v.

The **UNITED STATES**, Defendant–Appellee.

No. 93–5180.

United States Court of Appeals, Federal Circuit.

June 10, 1994.

Gordon H. Harris, Gray, Harris, Robinson, Kirschenbaum & Peeples, of Cocoa Beach, FL, argued for plaintiffs-appellants. With him on the brief were Jack A. Kirschenbaum

and J. Mason Williams, III. Of counsel was G. Robertson Dilg.

Stuart M. Benjamin, Attorney–Advisor, Office of Legal Counsel, Dept. of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Lois J. Schiffer, Acting Asst. Atty. Gen., Environment & Nat. Resources Div., Jacques B. Gelin and Edward J. Passarelli, Attys., Environment & Nat. Resources Div. Also on the brief were Russell W. Petit and John Brady, Office of Counsel, U.S. Army Corps of Engineers, of counsel.

Before MICHEL, PLAGER, and RADER, Circuit Judges.

RADER, Circuit Judge.

A class of 271 landowners (landowners), including the Applegates, filed a complaint in the United States Court of Federal Claims alleging a taking. The trial court dismissed the complaint as barred by the statute of limitations. *Applegate v. United States,* 28 Fed.Cl. 554 (1993). Because the landowners' claim did not accrue more than six years before its filing, this court reverses and remands for further proceedings.

## BACKGROUND

During the 1950s, the Army Corps of Engineers (Corps) undertook the Canaveral Harbor project. The River and Harbor Act of 1945, Pub.L. No. 79–14, 59 Stat. 10, 16 (1945) (partially codified at 33 U.S.C. § 603a (1988)), authorized the project. The project provided a deep-water harbor on the east coast of Florida just south of Cape Canaveral.

To construct the deep-water harbor, the Corps dredged a channel through a barrier island and into the Banana River Lagoon. To maintain the channel's entrance, the Corps constructed two jetties, one north and one south of the mouth of the harbor.

Before the Canaveral Harbor project, a natural southerly littoral flow of sand replenished 41 miles of white sandy beaches. The Canaveral Harbor project interrupted this littoral flow. From 1952 to the present, the Canaveral Harbor project has caused the shoreline north of the harbor to accrete and the shoreline to the south to recede. The landowners own property south of the harbor. Due to the interruption of the littoral flow of sand, the landowners have lost shoreline property. The erosion has permanently washed away and inundated portions of each of the landowners' property. In fact, the erosion of the shoreline threatens homesites in this region.

The River and Harbor Act of 1962 authorized over five million dollars for the construction of a sand transfer plant. River and Harbor Act of 1962, Pub.L. No. 87–874, 76 Stat. 1173, 1174 (1962) (partially codified at 33 U.S.C. § 426e–g (1988)). Further, the Senate Public Works Committee and the Florida Department of Natural Resources approved a Corps plan to restore the beaches in 1968. This plan relied on sand transfer technology. A sand transfer plant would restore the littoral flow and begin the process of rebuilding the beaches.

In 1971, however, the Corps announced a delay for further research and development on the plant. In 1975 and 1985, the Corps received inquiries from a United States senator about the sand transfer plant. In response to the 1975 inquiry, the Corps announced the availability of sand removed during construction of a Trident submarine base to replenish the lost beachfronts. On this basis, the Corps further delayed the proposed sand transfer plant. In October 1988, the Corps again proposed plans for a sand transfer plant. To date, the Corps has not yet built the sand transfer plant. Moreover, the Corps periodically dredges the channel, in all but a few occasions dumping the sand miles offshore.

In 1970, a single landowner brought suit under the Fifth Amendment in the United States Court of Claims alleging a taking of beachfront property in this region. This court's predecessor dismissed that claim on summary judgment because the channel is subject to a navigational servitude. *Pitman v. United States,* 198 Ct.Cl. 82, 457 F.2d 975 (1972).

In 1988, this court overruled a key portion of *Pitman. Owen v. United States,* 851 F.2d 1404, 1416 (Fed.Cir.1988) (in banc). In

*Owen,* this court acknowledged that navigational servitudes preclude compensation under the Fifth Amendment, but held that these servitudes do not extend above the high water mark. *Owen,* 851 F.2d at 1412. This court expressly noted that the *Pitman* decision cannot prevent compensation for erosion above the ocean's high water mark. *Id.* at 1413. The landowners in this case allege a taking of property above the high water mark.

On December 4, 1992, the landowners filed a complaint in the Court of Federal Claims asking for damages under the Fifth Amendment and for an injunctive order requiring the Corps to build the sand transfer plant. The United States moved to dismiss. The United States based its motion on the lack of Court of Claims' jurisdiction to provide injunctive relief and on the untimeliness of the filing under the six-year statute of limitations. 28 U.S.C. § 2501 (Supp. IV 1992). The Court of Federal Claims granted the motion. The landowners appeal only the statute of limitations bar.

## DECISION

■ This court reviews *de novo* decisions of the Court of Federal Claims on matters of law and reviews for clear error findings of fact. *Yancey v. United States,* 915 F.2d 1534, 1537 (Fed.Cir.1990). The Court of Federal Claims determined that the landowners' case warranted dismissal under the statute of limitations. Therefore, this court reviews the trial court's decision *de novo.*

■ The Fifth Amendment ensures that the United States does not take private property for public use without just compensation. *U.S. Const.* amend. V. The Amendment recognizes both the Federal Government's right to take private property for public uses and a property owner's right to just compensation. *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 315, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987); *Narramore v. United States,* 960 F.2d 1048, 1050 (Fed.Cir.1992).

■ When the United States does not provide compensation through eminent do-

main procedures, the Tucker Act, 28 U.S.C. § 1491 (1988), operates to enforce landowner's compensatory right. *Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 11–12, 110 S.Ct. 914, 921–22, 108 L.Ed.2d 1 (1990); *Narramore,* 960 F.2d at 1051. Thus, the landowners' claim properly lies within the jurisdiction of the Court of Federal Claims under the Tucker Act. Actions in the Court of Federal Claims must be filed within six years of the claim's accrual. 28 U.S.C. § 2501 (1988).

■ Therefore, this court's review of the trial court's action depends upon when this alleged taking accrued. The Supreme Court set forth the standard for accrual in cases alleging takings of a continual nature. *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). In *Dickinson,* the United States constructed a dam to improve the navigability of the Kanawha River in West Virginia. The dam, however, intermittently inundated property of riparian owners. The Government argued that the statute of limitations began to run either on October 21, 1936, when the dam began to impound water, or on May 30, 1937, when the property was first partially submerged. On April 1, 1943, these owners filed complaints alleging a taking. The trial court ordered just compensation. The United States challenged that finding, contending that the statute of limitations barred the claims.

Dickinson acquired land subject to flooding after its initial inundation. *Id.* The Court held a taking effected by a "continuing process of physical events" did not require the owner to resort to piecemeal or premature litigation to avoid the operation of the statute of limitations. *Id.* at 749, 67 S.Ct. at 1385. The Court reasoned:

> If suit must be brought, lest [the property owner] jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him—for instance, the uncertainty of the damage and the risk of *res judicata* against recovering later for damage as yet uncertain. The source of the entire claim—the overflow due to rises

in the level of the river—is not a single event; it is continuous.

*Dickinson,* 331 U.S. at 749, 67 S.Ct. at 1385.

On this basis, the Supreme Court clarified: "The Government . . . left the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in [an ongoing] process of acquisition by the United States when the fact of taking could no longer be in controversy." *Id.* at 748, 67 S.Ct. at 1384. Under these circumstances, the Supreme Court explained that the claimant can postpone filing a suit "until the [continuing taking] situation becomes stabilized." *Id.* at 749, 67 S.Ct. at 1385. In other words, the Supreme Court reiterated that the owner may wait until "the consequences of inundation have so manifested themselves that a final account may be struck." *Id.* Moreover, *Dickinson* discouraged a strict application of accrual principles in unique cases involving Fifth Amendment takings by continuous physical processes. *Dickinson,* 331 U.S. at 749, 67 S.Ct. at 1385.

In *United States v. Dow,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), the Court characterized *Dickinson* as follows:

> The expressly limited holding in *Dickinson* was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use.

*Id.* at 27, 78 S.Ct. at 1047. This case presents the same situation. The gradual character of the natural erosion process set in motion by the Corps, compounded by the Government's promises of a sand transfer plant, have indeed made accrual of the landowner's claim uncertain.

This court's predecessor, the United States Court of Claims, applied the *Dickinson* doctrine. *See, e.g., Castro v. United States,* 205 Ct.Cl. 534, 500 F.2d 436, 440 (1974) (property owner "not obliged to bring multiple piecemeal suits"); *Silverberg v. United States,* 155 Ct.Cl. 436, 1961 WL 8727 (1961); *Oro Fina Consolidated Mines, Inc. v. United States,* 118 Ct.Cl. 18, 92 F.Supp. 1016 (1950). Similarly, this court has followed the Supreme Court's test for accrual in the event of a continuing physical process of acquisition.

In *Cooper v. United States,* 827 F.2d 762 (Fed.Cir.1987), the United States, beginning in 1979, flooded timber on two hundred acres of land belonging to the Coopers. Trees died from root damage throughout the period of inundation. Applying *Dickinson,* this court stated that this taking by a continuous physical process did not stabilize until the property owner could ascertain the extent of the damage. Although trees began to die in 1979, the property owner could not determine "the extent of the destruction" until 1984 at which point he filed suit against the United States. Thus, Cooper faced no statute of limitations bar.

In both *Dickinson* and *Cooper,* stabilization of the taking situation depended on the seasonal cresting or receding of flood waters. In this case, however, the continuous physical taking process is very gradual. The shoreline is slowly receding over a period of years. Moreover, the almost imperceptible physical process has delayed detection of the full extent of the destruction—a necessary precondition of striking a final account.

The slow physical process, however, is not the only event inhibiting stabilization. The Corps itself has held forth the promise of a sand transfer plant for years. Authorized in 1962 and proposed again in 1988, the sand transfer plant would reverse the continuous erosion process. With a sand transfer plant in place, the landowners would encounter little, if any, permanent destruction of their shoreline property.

With promises of a sand transfer plant renewed as recently as 1988, the landowners did not know when or if their land would be permanently destroyed. The Supreme Court said in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982):

> [W]hen the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred.

*Id.* at 426, 102 S.Ct. at 3171. With plans for a sand transfer plant pending, the landowners had no way to determine the extent, if any, of the permanent physical occupation.

Of course, installation of the sand transfer plant will not eliminate the Government's obligation to compensate the landowners if the erosion amounts to a temporary physical taking. *Hendler v. United States,* 952 F.2d 1364, 1376 (Fed.Cir.1991). Here again, uncertainty has stayed accrual of the claim. The Government's promises to restore the littoral flow destroyed any predictability of the extent of damage to the land. The *Dickinson* doctrine protected the landowners from the risks involved in bringing a suit for a taking prior to stabilization.

Thus, due to both the very gradual nature of this particular continuous physical process and the Corps' promises to restore the littoral flow of sand, this taking situation had not stabilized by 1986—six years before the landowners filed suit. The statute of limitations does not bar this action.

The Court of Claims' rulings, binding upon this court and relied upon by the Court of Federal Claims, are consistent with this ruling on the stabilization doctrine. In *Columbia Basin Orchard v. United States,* 116 Ct.Cl. 348, 88 F.Supp. 738 (1950), the Government pumped water out of a mine shaft. The water caused an alkali lake to overflow and pollute a spring. The spring had irrigated a fruit orchard. The trees became unhealthy. Consequently, the owner abandoned the property as a producing orchard.

The orchard owner filed his taking complaint more than six years after the spring was no longer contaminated and more than six years after abandoning the orchard. Thus, the continuous physical taking process had entirely ceased more than six years before the filing of the suit. This court's predecessor determined that the claim accrued at least by the time the continuous taking process had ceased (the spring was no longer contaminated)—a factual circumstance not present in this case. Moreover, *Columbia Basin* also featured no lingering promises and proposals to correct the damage caused by the taking.

The Court of Federal Claims erroneously relied on *Nadler Foundry & Mach. Co. v. United States,* 143 Ct.Cl. 92, 164 F.Supp. 249 (1958), and *Barnes v. United States,* 210 Ct.Cl. 467, 538 F.2d 865 (1976), to limit the

*Dickinson* stabilization doctrine. These cases do not limit the application of *Dickinson* in this case.

In *Nadler,* the Court of Claims refused to apply the *Dickinson* doctrine when the Government's channel dredging allegedly caused Nadler's land to cave in. Nadler filed a taking complaint in 1954, but the court found that the same suit for the same damages could have been brought in 1934 at the time of an extensive cave-in followed by continuous caving. *Nadler,* 164 F.Supp. at 251. Thus, *Nadler* did not feature the uncertainties present in this case. For instance, in *Nadler,* there were no promises to correct the situation. In fact, the Government had in 1934 flatly rejected Nadler's demands for construction of protection against subsidence. In sum, the *Nadler* taking situation had stabilized in 1934.

In *Barnes,* the Court of Claims stated that a taking by flooding accrued in 1973, when "it first became clearly apparent by the passage of time that the intermittent flooding was of a permanent nature" rather than the date of the first flood in 1969. *Barnes,* 538 F.2d at 873. In this case, precisely because of the Government's promises to build a sand transfer plant, the landowners remain justifiably uncertain about the permanency of the erosion and the taking.

This court's application of *Dickinson* 's stabilization rule here does not invoke the continuing claim doctrine a contention raised by the parties. The continuing claim doctrine involves a series of distinct events pleaded to the court as a single overall event spanning many years. For example, in *Hart v. United States,* 910 F.2d 815 (Fed.Cir.1990), the Government did not notify a wife that her husband had elected to eschew participation in the Survivor Benefit Plan. Ms. Hart filed suit more than six years after her husband's death. The Claims Court determined that each month the Government did not pay Ms. Hart was a new claim for that month's sum. *Hart,* 910 F.2d at 818. Together, according to the Claims Court, these Government actions constituted a continuing claim. Thus, the trial court avoided the statute of limitations bar. Because "all events necessary to [Ms. Hart's] benefits claim had occurred

when her husband died," this court reversed. *Id.*

This case, however, does not involve a string of distinct events. Rather, the Corps set in motion a very gradual and perpetual physical process of taking. The Corps further complicated ascertaining the extent and nature of the consequences of this process with proposals to correct the damage. Thus, following the *Dickinson* doctrine, this taking situation had not stabilized. Therefore, the statute of limitations does not bar these landowners from bringing this suit.

## CONCLUSION

These landowners, suffering an ongoing, gradual, physical taking, need not risk premature litigation. Under the *Dickinson* rule, the statute of limitations did not bar this suit in 1992. This court reverses and remands for further proceedings.

## COSTS

Each party to bear its own costs.

*REVERSED AND REMANDED*